**MID–AMERICA TRUCK & EQUIPMENT, INC.**

v.

**MACK TRUCKS, INC., and Brockway Motor Trucks Division of Mack Trucks, Inc., Jointly and Severally.**

No. F–C–79–5020.

United States District Court,
W. D. Arkansas,
Fayetteville Division.

July 15, 1981.

Sandy S. McMath, McMath & Leatherman, P.A., Little Rock, Ark., and James A. Penix, Jr., Davis, Douglas & Penix, Springdale, Ark., for plaintiff.

H. William Allen, Allen, Cabe & Lester, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

ROY, District Judge.

This case involves an allegation of fraud and breach of contractual duty of good faith regarding the execution of a distributorship agreement in 1976 between the plaintiff, Mid-America Truck and Equipment, Inc. (Mid-America), and the defendant Brockway Motor Trucks (Brockway) which was a division of defendant Mack Trucks, Inc. (Mack).

The facts as developed at trial established that in early 1976, Mid-America wrote several large truck manufacturers, including Brockway, seeking to obtain a distributorship. All of the manufacturers replied that they were not interested in granting Mid-America a distributorship at that time. Brockway, however, on April 12, 1976, wrote to Mid-America stating that they had reevaluated the Mid-America application and that the granting of a distributorship was possible after a credit check and other necessary steps were taken.

Joe Helf and Marion Brown, officers of Mid-America, went to the home office of Brockway in Cortland, New York, and while there were promised by Brockway's regional manager that Brockway would assist Mid-America in getting a Cummins Engine distributorship. Such distributorships for engines are granted by the regional distributors and are very important to a truck dealer in terms of being able to perform warranty work on the engines.

The distributorship agreement between Mid-America and Brockway was signed by Helf in Cortland on July 6, 1976.

The president of Brockway, R.J. Matthews, signed the contract on behalf of Brockway on September 8, 1976, though Helf had been promised that Matthews' signature would be affixed shortly after his own, and the contract was then forwarded to Mid-America. At the time Matthews signed the contract, an addendum was attached which told of the possibility that Brockway might be sold to a "highly respected American company." (Plaintiff's Exhibit 14). That addendum stated, in pertinent part:

> Mack Trucks has received indications from a highly respected American company of its interest in the possible acquisition of Brockway. As presented, this interest is in retaining the present Brockway organization including its marketing network of branches and distributors.

The possibility of the sale by Mack of its Brockway division developed in the spring of 1976. The effect of the 1975 recession and the need for large amounts of additional capital led the executive committee of Mack on May 24, 1976, to instruct its financial vice president, Guy Coffelt, to seek a purchaser. Numerous prospective buyers were actively solicited over the next year, including CONDEC Corporation, the corporation referred to in the Mid-America contract addendum, and a Mexican group which produces Autocar trucks. Some of these prospective purchasers were taken to visit various Brockway distributors nationwide.

In addition to the letter addendum in the contract, all Brockway distributors, including Mid-America, were again notified in February of 1977 of the possible sale of the company. (Plaintiff's Exhibit 27). After numerous efforts to sell Brockway had failed and following a wildcat strike by the United Auto Workers at the Brockway plant, the Board of Directors of Mack Trucks, Inc., voted on March 24, 1977, to liquidate its Brockway division. (Defendant's Exhibit 32). On March 29, 1977, all Brockway distributors were notified of the decision to liquidate the division. (Defend-

ant's Exhibit 33). Even after the decision was made to liquidate, efforts continued to sell Brockway until the actual liquidation took place.

Plaintiff brought this action for breach of a contractual duty of good faith and fraud alleging that the defendant, at the time of the execution of the distributorship agreement (1) falsely represented that Brockway was solvent; (2) failed to disclose a proposed sale of Brockway; and (3) falsely represented that they would use their best efforts to assist plaintiff in securing a parts and service contract with Cummins Diesel.

Plaintiff's basis for the liability of the defendant is the allegation that the defendant purposefully misrepresented the financial condition of Brockway by concealing the fact that the defendant was attempting to sell its Brockway division and defendant's statements that they would help plaintiff get a Cummins distributorship. The facts developed at trial do not support the plaintiff's allegations.

Before it signed the distributorship contract, Mack attached an addendum to that contract, *supra*, which clearly indicated that an American company had expressed interest in the purchase of the company. The addendum letter was more than sufficient to properly put Mid-America on notice that a possible sale of Brockway might take place. Apparently, Mack had no plans to liquidate its Brockway division at the time plaintiff entered into its distributorship contract. Rather, Mack was only considering the sale of Brockway to entities that would continue the company as a going concern.

Further, the fact that potential purchasers were taken nationwide to various distributors and introduced to such distributors' operations is evidence that there was no attempt to hide from the distributors the probable sale.

Nor was revelation to distributors of a possible sale of Brockway limited to one letter and visits by potential purchasers. On February 4, 1977, the president of Brockway once again wrote all distributors, including Mid-America, and informed them of the possibility of a sale. (Plaintiff's Exhibit 27).

As to Mid-America in particular, George Sause, regional manager of Brockway at the time, testified that he discussed the possible sale of Brockway with Helf in Springdale soon after Mid-America received the executed contract. Sause wrote a report contemporaneously with his meeting with Helf which states, "Little reaction and little concern over RJM's [R.J. Matthews] letter of portending [sic] sales either here or at Friendly." (Plaintiff's Exhibit 17).

With regard to the allegation that the defendant misrepresented that it would help Mid-America get a Cummins distributorship, defendants contend that their failure to help Mid-America was in no way intentional. Such intention is, of course, required under the law.

R.J. Matthews, former president of Brockway, testified that it was very much to Brockway's advantage for all its distributors to have Cummins distributorships. If a Brockway distributor also had a Cummins contract, Cummins would pay directly to Brockway a certain percentage of the total sale of Cummins parts by the Brockway dealer. Plaintiff has not demonstrated that this omission was intentional. In addition, the evidence showed that, even if Brockway had tried to help Mid-America get a Cummins contract, it would have been to no avail. The manager of the Cummins, Mr. R.J. Arroyo, testified that there were sufficient Cummins distributors in the area, and he would not grant another.

■ Even if one assumes on defendant's part some purposeful failure to disclose matters, Herman Seiter, an employee of Jones Truck Lines who is responsible for ordering new trucks for the company, discussed with Helf the rumored poor financial condition of Brockway before Mid-America entered into the distributorship contract. It is well established in Arkansas law that when a plaintiff knows of a situation, he has no right to rely on defendant's statement to the contrary and, therefore, there can be no misrepresentation. *Edwards v.*

*Johnson*, 227 Ark. 345, 298 S.W.2d 336 (1957). See also *Vanderboom v. Sexton*, 460 F.2d 362 (8th Cir. 1972). The direct testimony of Seiter is revealing:

Q: Do you recall ordering 50 International Harvester trucks in 1976, Mr. Seiter?

A: Yes, I do.

Q: Did I ask you to look up the date on which you ordered those?

A: Yes, you did.

Q: What is the date?

A: June 14, 1976.

Q: Prior to that time, were you present during a conversation with Mr. Joseph Helf in which Mr. Helf was trying to sell Jones Truck Line 50 Brockway trucks?

A: Oh, yes, I've talked with Mr. Helf several times.

Q: Do you recall the conversation with regard to the 50 trucks that I referred to?

A: I can remember talking to Mr. Helf.

Q: All right. What did you say during that conversation with Mr. Helf in regard to Jones Truck Lines' attitude about Brockway?

A: Well, I told him at that time that I'd been reading in journals, in magazines, that I get, that Brockway was on shaky ground.

Q: Shaky ground financially?

A: Financially, yes, sir.

Q: Did that cause you concern?

A: Why, certainly, it would.

Q: What did Mr. Helf say in response to that?

A: He told me, he said, "You wouldn't have any trouble with parts." He said, "You could buy them from Mack Trucks."

Seiter reaffirmed on redirect that it was sometime prior to June 14, 1976, that he told Helf that Brockway was having financial problems.

Helf knew after his discussion with Seiter that there might be a possibility that Brockway was in some financial difficulty. He knew this before entering into the contract. Helf had worked in the truck sales industry for a number of years and certainly was not unsophisticated in his knowledge of the industry. Even if Brockway had misrepresented its condition, Mid-America would have no right to rely on such a misrepresentation because of its own knowledge to the contrary at the time of the execution of the contract.

█ The evidence at trial established that the plaintiff, upon learning of the possible sale of Brockway, did not immediately repudiate the contract and seek recission, but, rather, affirmed the contract and proceeded to enjoy its benefits. By such actions, plaintiff waived its right to seek damages. It cannot now be heard to argue that it incurred damages because all such alleged damages could have easily been avoided at the time it learned of the possible sale.

The evidence is undisputed that Helf, president of Mid-America, became aware of the possible sale of Brockway and the significance of such a sale when he received the signed contract with the addendum attached. Helf admitted in his deposition:

Q: All right. Did you read that addendum when it came in?

A: Yes, sir.

Q: Did it cause you any concern?

A: Yes, sir.

Q: Did you do anything about it; call anybody or talk to anybody?

A: I cried a little. I wouldn't say that I grabbed the phone and called somebody right then, but I was in contact with Brockway, you know, within a very short period. (Deposition of Joseph Helf at p. 70. Defendant's Exhibit 29).

This reaction was confirmed in Helf's testimony at trial where he admitted that he called Brockway immediately upon receiving the addendum, although he still could not recall the contents of the conversation or who he talked to. He also admitted on cross examination that the addendum does indicate that Brockway would be sold intact. In addition, as previously mentioned, Helf discussed the addendum with George Sause, regional manager of Brockway, soon after he received the contract. Further,

Helf received the February 4, 1977, letter to all distributors (Plaintiff's Exhibit 27) discussing the sale. If there was some misrepresentation, Mid-America was aware of it after Helf's conversation with Sause or by the time of the February letter at the latest. At no point did Mid-America make any attempt to repudiate the contract and seek recission.

Mid-America had ample opportunity to rescind the contract at the time they became aware of the possible sale or other alleged misrepresentations. They decided, however, to continue on the path they had chosen. Once they decided not to turn back, the law estops them to claim relief from a choice of their own making.

Assuming, *arguendo*, that plaintiff's allegations had been proven, it would then have to show that it had been damaged thereby. However, plaintiff also failed to demonstrate its damages. Its claims for lost profits, not allowed in a fraud action under New York law, *Foster v. Di Paolo*, 236 N.Y. 132, 140 N.E. 220 (1923), were speculative to the point that it would be impossible for the Court to arrive at an accurate figure. The Court must also point out that, despite its claims of large profits lost, Mid-America was never profitable in the time it was in operation.

Plaintiff urges that it lost $176,000.00 from the loss of sales of new Brockway trucks. This figure is based upon projected sales by Mid-America of 50 to 70 new Brockway trucks a year. (Exhibit 28). Such an assumption cannot be accepted. Defense Exhibit 37B shows that between 1970 and 1978, Brockway never had more than 1.9% of the total national market of the type of trucks Brockway produced. Also, during the year Mid-America sold new Brockway trucks, they had only .6% of the market for a nine-county area in northwest Arkansas. (Defense Exhibit 37F). Yet, in order to accept plaintiff's assumption that it could sell between 50 and 70 trucks a year, one would have to accept that Mid-America could gain up to 26% of the market share in its area—more than twenty times the largest share Brockway has ever had of

the national market. (Defense Exhibit 37G).

Furthermore, evidence adduced at trial showed that plaintiff had no claim for lost future profits from the sale of new Brockway parts since there was nothing preventing it from selling such parts.

R.J. Matthews, former president of Brockway, testified that Brockway dealers to this day can and do order new Brockway parts despite the fact that the division no longer produces new trucks. This fact was brought to the attention of Mid-America in a letter from Brockway dated April 11, 1977:

> The distribution of Brockway service parts and the furnishing of technical aid to the field will also continue. (Defendant's Exhibit 34)

Plaintiff's president, Joseph Helf, admitted upon cross examination that he did not realize until the trial that he could have purchased new Brockway parts at distributor prices after Brockway ended production of new trucks.

In addition, any putative lost profits from the sale of new Brockway parts attributable to the cessation of production of the trucks are as speculative as the projections for sales of the Brockway trucks upon which parts sales depend.

As for plaintiff's claims for lost profits from sales of service and parts for Cummins engines, as previously discussed, the failure of Mid-America to obtain a Cummins distributorship was not the fault of Brockway. Cummins, according to Mr. Arroyo of Cummins Mid South in Arkansas, had sufficient dealers in the area already, and even the intervention of Brockway would not have caused him to award Mid-America a distributorship. Therefore, there can be no claim for lost profits from Cummins parts and service sales against Brockway.

The defendant is not liable to the plaintiff because it never misrepresented any material fact in its dealings with the plaintiff. The possible sale of Brockway by Mack was known to Mid-America, and at no time did they seek to rescind their contract.

If there was any misrepresentation, plaintiff became aware of it soon after it occurred and did nothing. Therefore, plaintiff is estopped to bring this action.

Furthermore, plaintiff was unable to prove any actual pecuniary loss that was suffered as a result of serving as a Brockway dealer. Any lost future profits are not recoverable in a misrepresentation action, and even if they were, plaintiff's alleged lost profits are too speculative to meet the legal standard of certainty.

The Complaint of the plaintiff is dismissed, and Judgment shall be entered for the defendant.